IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| EDITO ROSA, | CASE NO. 1:20-cv-02657 |
| Petitioner, | DISTRICT JUDGE BENITA Y. PEARSON |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| WARDEN KENNETH BLACK, | |
| Respondent. | **REPORT & RECOMMENDATION** |

Edito Rosa filed a Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus. Doc. 1. Rosa is currently in custody at the Noble Correctional Institution serving an aggregate eight-year sentence imposed by the Cuyahoga County Court of Common Pleas in *State v. Rosa*, Case No. CR-17-615294-A. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Court dismiss Rosa's petition.

## Summary of underlying facts

In habeas corpus proceedings brought under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1). "This presumption also applies to the factual findings that [a] state appellate court makes on its review of the state trial record." *Johnson v. Bell*, 525 F.3d 466, 474 (6th Cir. 2008). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. *Id.*

The Ohio Court of Appeals for the Eighth Appellate District summarized the facts underlying Rosa's conviction as follows:

> {¶2} In March 2017, Rosa was named in a fifteen-count indictment charging him with one count of rape, with a notice of prior conviction and a repeat violent offender specification; three counts of kidnapping, with each count containing a notice of prior conviction, repeat violent offender and sexual motivation specifications; three counts of gross sexual imposition; two counts of robbery, with one count containing a notice of prior conviction and a repeat violent offender specification; two counts of aggravated menacing; and one count each of theft, disrupting public services, criminal damaging or endangering, and telecommunications harassment.

> {¶3} Prior to trial, Rosa executed a jury waiver on the notices of prior conviction and repeat violent offender specifications. All other counts and specifications were tried before a jury, who heard the following evidence.

> {¶4} Rosa and the victim began dating in January 2017. At the time, the victim was still married and also dating another man. The victim testified that although she told Rosa in February 2017 that she did not want to continue dating him, she agreed to go to his house on March 6, 2017.

> {¶5} When the victim did not show as planned, Rosa continuously called and texted her until midnight, leaving aggressive messages on her voicemail. She ignored them at first; however, at midnight she received video messages and photographs of her and Rosa hugging and kissing. Rosa told her that he would post the pictures on Facebook, which she perceived to be a threat. The victim stated that she then called Rosa, who told her that if she did not come to his house, he was going to kill her and her teenage son. The victim told her son about the threatening messages, and then went to Rosa's house.

2

{¶6} The victim testified that when she arrived at his house, Rosa was sitting naked in the recliner and a bottle of beer and cocaine were on the table. The victim testified that she again told Rosa that she did not want to date him anymore. When she attempted to leave, Rosa slapped the victim in the face, pushed her against the television, and told her she was "not going anywhere, you're going to stay here." (Tr. 337.) Eventually the victim convinced Rosa that she needed to go home and get her anxiety medication. According to the victim, Rosa stated that she could go, but that he would drive her home.

{¶7} When they got outside, the victim attempted to run away, but Rosa tackled her to the ground. As the victim tried to get up, Rosa pulled her toward the house. The victim testified that she started resisting and struggling to escape because she felt that if she went into the house she would never come out. She stated that Rosa pulled her hair, held her down by placing his knee on her back, and choked her with his arm. She stated that she was able to break free and knock on a neighbor's house, while screaming for "help," and that "he's going to kill me." (Tr. 341.) However, no one responded. According to the victim, Rosa told her "if you don't get your ass in the house, I'm going to knock you the f*** out and drag you in myself." (Tr. 343.) The victim testified that she felt like she was going to die if he got her inside the house, so she tried to hold onto her car to prevent Rosa from getting her inside. However, Rosa banged her head against the car and forced her inside the house. During this assault, the victim received a call on her cell phone from her then-husband, but Rosa grabbed the phone and smashed it on the driveway.

{¶8} The victim testified that she had mud all over her clothing from wrestling with Rosa in the yard and driveway. After Rosa forced her into the house, he pulled her into the bathroom, took off her muddied clothes, and forced her into the shower. He got into the shower with her and touched her breasts, vagina, and buttocks. The victim testified

3

that she did not want him touching her, but did not protest because she thought that if she was compliant, he would not assault her anymore and he would let her go home.

{¶9} The victim stated that as she became compliant, Rosa calmed down and, after the shower, Rosa told her to get into the bed with him. The victim testified that she told him whatever she needed to in order to leave the house, including that she would move in with him later that day.

{¶10} When her alarm went off at 6:00 a.m. and she started gathering her clothes, Rosa became agitated and told her "no, no, you know what you have to do before you go." (Tr. 351.) According to the victim, she knew that he meant that he wanted sex. The victim told him that she was not feeling well and that they could engage in sexual activity after work; however, Rosa told her that she was "not leaving here until we do it." (Tr. 352.) The victim testified that she then "laid on the bed and I let him do what he had to do." *Id*. She stated that she kept telling him that her stomach hurt while he was having sex with her. Afterward, Rosa allowed her to leave to go to work.

{¶11} The victim left Rosa's house and went straight home where she immediately told her son what had happened, and she used his cell phone to call 911. The victim's 911 recording was played for the jury. The jury heard the victim tell the dispatcher that she was tortured all night, held against her will, and physically assaulted by Rosa. When the dispatcher asked her how she escaped, the victim stated, "I did what he wanted; I pretended everything was okay." The victim was treated and transported by EMS to MetroHealth Hospital where a SANE examination was performed, a rape kit compiled, and photographs were taken of the victim's injuries. The victim also met with Detective Cynthia Adkins and provided a statement.

{¶12} In the days following, Rosa attempted to contact the victim. In voicemails and text messages,

4

Rosa apologized for what had occurred and indicated he was sorry for hurting her, blaming his actions on drugs and alcohol. The jury saw social media posts in which Rosa claimed he "messed up." Photographs were displayed showing the victim's injuries, the exterior and interior of Rosa's house, and the muddy clothes that the victim was wearing when the attack occurred.

{¶13} The jury found Rosa not guilty of one count of robbery (Count 7) and one count of aggravated menacing (Count 14), but guilty of all the remaining counts and specifications, and the trial court found him guilty of the notices of prior conviction and repeat violent offender specifications.

{¶14} Prior to sentencing, the trial court determined that Count 1, rape, and Count 2, kidnapping, merged for sentencing, with the state electing to sentence Rosa on the rape offense. The court also determined that the gross sexual imposition offense charged in Count 5 and the kidnapping offense charged in Count 6, merged for sentencing, with the state electing to sentence Rosa on the gross sexual imposition offense. The trial court imposed a total sentence of eight years in prison.

*State v. Rosa*, 2019-Ohio-4888, 2019 WL 6358475, at *1–2 (Ohio App. Ct. Nov. 27, 2019).

## Procedural background

*Trial court proceedings*

A Cuyahoga County grand jury indicted Rosa in March 2017, on fifteen counts, including one count of rape with a repeat violent offender specification; three counts of kidnapping, with a specifications for sexual motivation, prior conviction, and repeat violent offender; three counts of gross sexual imposition; two counts of robbery, one with specifications for a prior conviction and a

repeat violent offender; one count of theft; one count of disrupting public services; one count of criminal damaging or endangering; one count of telecommunications harassment; and two counts of aggravated menacing. Doc. 9-1, at 5–11.

During Rosa's trial, Cleveland police detective Cynthia Adkins testified. Doc. 9-5, at 23. Adkins testified that she was assigned to Rosa's case in March 2017. *Id*. at 33. She testified that she interviewed the complaining witness, MV, and observed that MV's cell phone was shattered. *Id*. at 35. Adkins also noted that MV's clothes and shoes were muddy and her purse was "full of mud." *Id*.; *see id*. at 38 (reporting that MV "described being dragged through the mud").

Adkins testified that she executed a search warrant on Rosa's home two days after Rosa raped MV. Doc. 9-5, at 41–42. Detective Adkins testified about the search and the items taken from Rosa's home, including four cell phones and bed sheets. *Id*. at 43–46. The following colloquy then took place between the prosecutor and Adkins:

> Q.    Okay. After executing the search warrant, what is the next thing you did in your investigation?
>
> A.    Well, all of this property that we took would have been marked and entered into a property book, as well as our report system, and I attempted to speak with Mr. Rosa.
>
> Q.    And did he wish to – don't tell us what it is, but did he wish to give you a statement?
>
> A.    No.
>
> Q.    Okay. Mr. Rosa did not want to talk to you?

6

A.    No.

Doc. 9-5, at 47. Adkins then discussed her examination of two of Rosa's phones and the conversations contained in them between Rosa and MV. *Id*. at 47–49.

During MV's testimony, the prosecutor showed MV a serious of photographs, which depicted parts of Rosa's home, and asked MV to identify what was shown in them. *See* Doc. 9-3, at 163–167. In the midst of this line of questioning, MV identified the master bedroom and the following discussion took place:

> Q.    Is that the bedroom that you laid in with him?
>
> A.    Yes.
>
> Q.    I want to be a little more specific. Before you told us you had sex, with him, can you tell us what type of sexual activity occurred?
>
> A.    He just had -- we just had regular sex, him on top of me. That's it.
>
> Q.    Vaginal sex?
>
> A.    Yes, vaginal sex.
>
> Q.    Did he penetrate you?
>
> A.    Yes. That is his room to go out into the back. Like, there's a sun room off of there, but it's off of his bedroom.

*Id*. at 164–65.

The prosecution also called MV's eighteen-year-old son, AP, to testify. Doc. 9-4, at 67. He testified that after his mother and stepfather divorced, he (AP) moved in with his mother in February 2016. *Id*. at 69. At some later point,

MV introduced AP to Rosa. *Id*. at 70–71. AP testified that MV and Rosa "were seeing each other" at that point. *Id*. at 72. The following colloquy then occurred:

> Q.    Did there ever come a time when he came over to your house uninvited?
>
> A.    Yes.
>
> Q.    Can you please describe for the jury when that occurred.
>
> A.    I recall sitting in my room and hearing a lot of loud banging outside of the house. So I go to my mom's room, and I asked her what the loud banging is, she said that it was him.
>
> Q.    Without getting into what she said, did the banging continue?
>
> A.    For a good five minutes afterwards, yes.
>
> Q.    Okay. Did there come a time when the banging stopped?
>
> A.    Yes.
>
> Q.    How did that happen?
>
> A.    When my mom left the house to go outside and talk to him.
>
> Q.    Now, you say "him," who are you referring to?
>
> A.    Mr. Rosa.
>
> Q.    How do you know that it was Mr. Rosa banging on the door?
>
> A.    When I saw his face when she cracked the door open to talk to him.
>
> Q.    Could you hear his interaction with your mom after she went outside?
>
> A.    Not really. As soon as I saw his face, I went back to my room.
>
> Q.    When you saw his face, could you tell if he was angry, yelling?
>
> A.    Yeah, he had a very unhappy expression on his face.

8

> Q.    Was that last time that you saw Mr. Rosa prior to March 7th?
>
> A.    Yes.

*Id.* at 72–73.

The prosecution then turned to March 6, 2017, which was the day before the rape. Doc. 9-4, at 73. AP testified that his mother's demeanor was normal that day. *Id*. at 74–75. When AP arrived home late that evening, he heard MV arguing on the phone and noticed that she "had begun to act a little strange, … was shaking a little bit[,] [a]nd … couldn't really think straight." *Id*. at 75. Also, "[s]he was stumbling upon her words, and … didn't know what to do." *Id*.

At some point, MV left her home and went to Rosa's house. *Id*. at 76. AP testified that she returned early the next morning and shook AP awake. *Id*. at 77. AP said that MV "was very fidgety and scared" and "just looked like a complete mess." *Id*. He added that "[s]he could barely speak. She was so choked up, she was crying over every word she tried to pronounce." *Id*. The following then occurred:

> Q.    Was she eventually able to get words out to you?
>
> A.    Yes, after a quick, brief breakdown.
>
> Q.    What, if anything did she say?
>
> MR. RICHARDSON:[1]  Objection, your Honor.

---

[1]    The transcript indicates that this objection was lodged by one of the prosecutors. *See* Doc. 9-4, at 78. This is an obvious scrivener's error. In context, this objection could only have been lodged by Richardson, who was Rosa's counsel.

9

> THE COURT:         Sustained.
>
> MS. RASKIN:         May we approach, your Honor?
>
> THE COURT:         Yeah, you can.
>
> (Thereupon, a discussion was had between Court and counsel at sidebar.)
>
> THE COURT:         Ms. Raskin would you mind asking that question again, please.
>
> Q.    When your mother was able to finally able to speak, what did she say?
>
> MR. RICHARDSON:    I'm going to renew the objection.
>
> THE COURT:         That's overruled. You may answer.
>
> A.    First thing she said was that Mr. Rosa had beaten and raped her all night. That was the first intelligible thing I could hear that she had.

Doc. 9-4, at 77–78.

Later, AP testified that MV called 911 and "was very antsy[,] … walking back and forth" while waiting for police and an ambulance." Doc. 9-4, at 80. He had never seen his mother as scared as she was then and had not since seen her display the same behavior. *Id*. at 80.

Richardson objected four times during AP's testimony. *See* Doc. 9-4, at 76, 78, 91 (two objections).

After AP testified, counsel and the trial court discussed a report that had been prepared by a sexual assault nurse examiner, referred to throughout as a "SANE nurse." Doc. 9-4, at 96–97. The parties agreed about how to handle

the report and that certain matters would not be elicited during the parties'
examination of the SANE nurse. *Id.* at 96–97.

The prosecution then called Joya Riffe, who was the SANE nurse who
treated and examined MV. Doc. 9-4, at 107. Riffe testified about her training
and what her duties as a SANE nurse entailed. Doc. 9-4, at 100–07. Riffe
testified about MV's medical records and what was reflected in them in relation
to MV's visit to the emergency room on March 7, 2017. *Id.* at 108–12. The
prosecutor asked Riffe if Riffe was able to obtain MV's consent to be examined.
*Id.* at 112. Riffe affirmed that she able to do so. *Id.* The following discussion
then occurred:

> Q.     After getting consent from [MV], what is the
> next thing that you did?
>
> A.     Actually to get an assault history from the
> patient.
>
> Q.     Tell me about that process.
>
> A.     The process is just I go down into step two,
> just asking her questions about the assault history,
> and she will answer yes, no, or unsure.
>
> Q.     Okay. And we're up to Page 26 of the record;
> is that right?
>
> A.     Yes.
>
> Q.     Her name [MV]. You see a date and time of
> the assault?
>
> A.     Yes, I do.
>
> Q.     Can you tell me what that information is?
>
> A.     The date and time of the assault is 3/7/17 at
> 0330.
>
> Q.     And the date and time of the exam?
>
> A.     3/7/17 and 0948.

11

> Q.     And that assault was by -- was there a name under there[?]
>
> A.     Yes, it is.
>
> Q.     Who is that?
>
> A.     Edito Rosa.
>
> Q.     Okay. And looks like there is a category for her to circle how she knows the person, the options being stranger, acquaintance, spouse, relative, date, et cetera?
>
> A.     Acquaintance.

*Id.* at 112–14.

Later, the prosecution called Paul Tatangelo to testify. Doc. 9-5, at 3. Tatangelo was a paramedic who treated MV on March 7, 2017. *Id.* at 5. He explained that when he responds to an emergency call, he "complete[s] a patient care report," which is "[b]asically a recorded patient care document that pertains to the patient's condition at the time." *Id.* Tatengelo identified state's exhibit 75, which was MV's patient care report. *Id.* at 6.

The prosecutor then asked Tatangelo a series of questions about the report. *See id.* at 8–9. The following then occurred:

> Q.     Okay. Did she tell you with the purpose of your  medical treatment what had happened to her?
>
> A.     She disclosed everything that happened to her. Yes, she did.
>
> Q.     Looking at your narrative, can you read for us what she told you?
>
>        MR. RICHARDSON: Just wanted to put in an objection on this one, Judge.
>
>        THE COURT:        Overruled.

> A.  She stated that she was involved in a physical altercation with Mr. Edito Rosa. She stated that Mr. Rosa attacked her in his driveway. She was punched several times and choked on top of her car. She was then forced inside his home. Patient also stated she was covered in mud, and he made her take a shower with him. Around 5:00 a.m., in fear for her life, she was forced to have sex with him. After sex, the patient made an agreement to move in with him. He then allowed her to leave the home. The patient states she drove to her home, where she then called 911.

*Id.* at 9.

At the conclusion of Rosa's trial, the jury found him guilty of all but one of the robbery counts and one of the aggravated menacing counts. Doc. 9-1, at 28. The trial court sentenced Rosa to an aggregate eight-year term of imprisonment. *Id.* at 35–36.

*Direct review*

Through new counsel, Rosa filed a timely notice of appeal. Doc. 9-1, at 37. In his appellate brief, Rosa raised four assignments of error:

> 1. The Defendant's conviction for rape (Count 1) and kidnapping (Count 2) was based upon insufficient evidence, in derogation of his right to due process of law under the 14th Amendment to the United States Constitution.
>
> 2. The trial court erred in admitting into evidence the narrative given by the alleged victim to the Emergency Medical Service technicians.
>
> 3. The trial court erred in admitting evidence Det. Adkins' testimony that Rosa declined to make a statement to the police.

13

> 4. The trial court erred by imposing a six-year prison
> sentence on Fourth degree felony.

*Id.* at 50–70.

The Ohio court of appeals affirmed in part on November 27, 2019. Doc.
9-1, at 89–107. The court rejected most of Rosa's arguments but ordered a
limited remand to vacate the sentence imposed on one count, to resentence on
another, and to issue certain nunc pro tunc entries.[2] *Id.* 106. It denied Rosa's
application for en banc review on February 11, 2020. *Id.* at 134.

Meanwhile, on December 30, 2019, Rosa filed a pro se notice of appeal
with the Ohio Supreme Court. Doc. 9-1, at 136. In his memorandum in support
of jurisdiction, he raised three propositions of law:

> I. Appellant contends that his convictions for rape
> set forth in Count I, and kidnapping as charged in
> Count 2, were based on insufficient evidence in
> derogation of his right to due process of law under
> the Fourteenth Amendment to the United States
> Constitution.
>
> II. The court of appeals erred by finding that the
> narrative given by the victim to the Emergency
> Medical Service Technician was admissible
> pursuant to Evid.R. 803(4) because it was made in
> aid of medical diagnosis and treatment.
>
> III. Appellant contends that the trial court erred in
> admitting Detective Adkins testimony that
> Appellant declined to make a statement to police
> because it violated his right to due process by

---

[2] The trial court held the hearing on remand in May 2021. Doc. 9-1, at
242–44. The Court merged two counts for sentencing purposes and vacated the
previously imposed sentence on one count. *Id.* at 242. Rosa's aggregate eight-
year sentence, however, remained unchanged. *Id.* at 244.

>       impermissibly commenting on his post arrest
>       silence.

Doc. 9-1, at 138–49. On March 17, 2020, the Ohio Supreme Court declined

under Rule 7.08(B)(4) of its rules of practice to accept jurisdiction. *Id.* at 169.

Martinez did not seek review in the United States Supreme Court.

    *Collateral review*

    On April 20, 2020, Rosa filed a pro se application under Ohio Appellate

Rule 26(B) to reopen his appeal.[3] Doc. 9-1 at 170–80. Rosa asserted that his

appellate counsel had been ineffective for not raising four assignments of error

on appeal:

>       1. Appellant's Sixth Amendment right to Appellate
>       counsel under the U.S. Constitution was violated by
>       appellate counsel's inadequate performance for
>       failing to raise the issue that trial counsel failed to
>       object during the victim's testimony.
>
>       2. Appellant's Sixth Amendment right to Appellate
>       counsel under the U.S. Constitution was violated by
>       appellate counsel's inadequate performance for
>       failing to raise the issue that the trial court
>       committed plain error in admitting impermissible
>       evidence regarding his character during the victim's
>       son's testimony, A.P.

---

[3]    Rule 26(B)(1) provides:

>       A defendant in a criminal case may apply for
>       reopening of the appeal from the judgment of
>       conviction and sentence, based on a claim of
>       ineffective assistance of appellate counsel. An
>       application for reopening shall be filed in the court
>       of appeals where the appeal was decided within
>       ninety days from journalization of the appellate
>       judgment unless the applicant shows good cause for
>       filing at a later time.

15

> 3. Appellant's Sixth Amendment right to Appellate counsel under the U.S. Constitution was violated by appellate counsel's inadequate performance for failing to raise the issue that the trial counsel failed to object during the victim's son testimony, A.P.
>
> 4. Appellant's Sixth Amendment right to Appellate counsel under the U.S. Constitution was violated by appellate counsel's inadequate performance, for failing to raise the issue that trial counsel failed to object during Joya Riffe's testimony, the SANE nurse.

*Id.* at 170–80. The court of appeals denied Rosa's application on August 4, 2020. *Id.* at 203–12.

On August 27, 2020, Rosa filed a pro se notice of appeal with the Ohio Supreme Court. Doc. 9-1, at 213. In his memorandum in support of jurisdiction, he raised the three propositions of law:

> 1. Appellate counsel was deficient because he failed to argue that trial counsel failed to object when the prosecutor gave the victim the answer she desired in violation of the Sixth Amendment to the U.S. Constitution.
>
> 2. Appellate counsel was deficient because he failed to argue that trial counsel should have objected during the victim's son's testimony because it was not indicative of appellant's scheme or plan, in violation of the Sixth Amendment to the U.S. Constitution.
>
> 3. Appellate counsel was deficient because he failed to argue that trial counsel failed to object when SANE nurse read appellant's full name in open court, when his name is not related to the diagnosis or treatment, in violation of the Sixth Amendment to the U.S. Constitution.

16

*Id.* at 215–28. On October 13, 2020, the Ohio Supreme Court declined under Rule 7.08(B)(4) of its rules of practice to accept jurisdiction. *Id.* at 241. Rosa did not seek review in the United States Supreme Court.

*Federal habeas proceedings*

Rosa filed his pro se petition for writ of habeas corpus on November 23, 2020. Doc. 1, at 16. He raised the following grounds for relief:

> *Ground one*: Petitioner's conviction for rape and Count 2-kidnapping was based on insufficient evidence in violation of the 14th Amend. to the U.S. Constitution.
>> *Supporting facts*: The State presented no evidence that Petitioner purposely compelled the 40-year old victim to submit by force or threat of force to engage in sexual conduct. The victim testified that Petitioner may use force if she tried to leave his house. The alleged violence and assault occurred in the yard and driveway when she attempted to leave his house.

> *Ground two*: The trial court violated Petitioner's due process right by admitting testimony of his post-arrest silence under the 14th Amend. to the U.S. Constitution.
>> *Supporting facts*: The trial court allowed Detective Adkins to testify that after she Mirandarized Petitioner, he did not wish to give her a statement about the allegations or talk to her. Petitioner argues that her testimony was used by the prosecution as implicit evidence or inference of his guilt.

> *Ground three*: Appellate counsel was ineffective for failing to present arguments that trial counsel failed to object in relation to the 6th and 14th Amend to the U.S. Constitution.
>> *Supporting facts*: Trial counsel failed to object to the leading questions during the victim's

17

testimony, (2) trial counsel failed to object during the victim's son's testimony concerning petitioner's alleged prior bad acts and about his character, and (3) counsel failed to object to the SANE nurse's reading of Petitioner's name as the alleged perpetrator.

*Ground four*: The trial court erred in admitting into evidence the narrative given by the victim to the EMS technicians, which is an objectively unreasonable application of *Chapman v. California*. *Supporting facts*: Petitioner argues that the victim's statements were impermissible, specifically: where she stated, "around 5:00 p.m., in fear of her life, the victim was forced to have sex with Rosa.["] Petitioner argues this statement did not aid in providing medical care and treatment but only served to aid in prosecution. The victim's statement went to the very issue at trial—his purposeful intent to force the victim to engage in sexual conduct.

Doc. 1, at 6–11. Respondent Warden Kenneth Black filed a return of writ in response. Doc. 9. Rosa filed a traverse. Doc. 10.

## Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, § 104, 110 Stat. 1214 (AEDPA or the 1996 Act), habeas petitioners must meet certain procedural requirements to have their claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes

confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). But when "state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review." *Id.*

*Exhaustion*

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Robinson v. Horton*, 950 F.3d 337, 343 (6th Cir. 2020). A state defendant with federal constitutional claims must "fairly presen[t]" those claims to the state courts before raising them in a federal habeas corpus action. *Robinson*, 950 F.3d at 343 (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999); *Caver v. Straub*, 349 F.3d 340, 345 (6th Cir. 2003). And a habeas petitioner must "present[] both the factual and legal basis for [the] claims to the state courts." *Hanna v. Ishee*, 694 F.3d 596, 606 (6th Cir. 2012). This means that the "petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law." *Koontz*

*v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). "'[G]eneral allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present claims" that specific constitutional rights were violated.'" *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017) (quoting *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006)).

*Procedural default*

Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." *Id.* In *Maupin v. Smith*, the Sixth Circuit directed courts to consider four factors when determining whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

20

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id*. While the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), a petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review. *Williams*, 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and establish that actual prejudice resulted from the alleged violation of federal law, or show that a fundamental miscarriage of justice will result if the petitioner's claims are not considered. *Coleman*, 501 U.S. at 750.

*Merits review*

To obtain habeas relief under 28 U.S.C. § 2254, a petitioner must show either that the state court decision (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the" United States Supreme Court ("contrary to" clause); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" ("unreasonable application" clause). 28 U.S.C. § 2254(d).

21

Under the *contrary to* clause, a federal habeas court may grant a writ if the state court "arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under the *unreasonable application* clause, a federal habeas court may grant the writ "if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "Clearly established federal law" refers to the holdings, not dicta, of the Supreme Court's decisions as of the time of the relevant state court decision, and legal principles and standards flowing from Supreme Court precedent. *Id*. at 412; *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). A state court is not required to cite Supreme Court precedent or reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see White v. Woodall*, 572 U.S. 415, 426 (2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not

require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").

In determining whether the state court's decision involved an unreasonable application of law, the Court uses an objective standard. *Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "A state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

**Discussion**

*1. Ground one fails on the merits*

In ground one, Rosa asserts that there was insufficient evidence to support his convictions for rape and kidnapping. Doc. 1, at 6. When reviewing a claim that a petitioner's conviction is not supported by sufficient evidence, the court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This "standard 'gives full play to the responsibility of the

trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Jackson*, 443 U.S. at 319). In applying the standard, the court defers to the trier-of-fact's determination. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). The court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the [fact-finder]." *Id.*; *see also Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal quotations and citations omitted); *see also Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct evidence").

On federal habeas review, an additional layer of deference applies. *Brown*, 567 F.3d at 205; *see Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, the Court defers "to the trier-of-fact's verdict, as contemplated by *Jackson*." *Davis*, 658 F.3d at 531. And second, the Court defers under the 1996 Act the state courts' "consideration of the trier-of-fact's verdict." *Id*. So even if this Court would conclude in the first instance that a rational trier-of-fact could not have found Rosa guilty beyond a reasonable doubt, the Court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205; *see also White v. Steele*, 602 F.3d 707,

710 (6th Cir. 2009). This doubly deferential "standard erects 'a nearly insurmountable hurdle' for petitioners who … seek habeas relief on sufficiency-of-the-evidence grounds." *Keys v. Booker*, 798 F.3d 442, 450 (6th Cir. 2015) (quoting *Davis*, 658 F.3d at 534)).

With this background in mind, Rosa asserts that the prosecution failed to "present[] … evidence that [he] purposely compelled the 40-year old victim to submit by force or threat of force to engage in sexual conduct." Doc. 1, at 6; *see* Doc. 10, at 15 (contending that "the state failed to present sufficient evidence … that he used … force or the threat of force"). He adds that MV "testified that [he] may use force if she tried to leave his house," but that "[t]he alleged violence and assault occurred in the yard and driveway when she attempted to leave his house." *Id*.

This argument barely gets out of the starting gate. Recall that under *Jackson*, a reviewing court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. One need only to review MV's testimony to know that (1) "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," and (2) a court could only reach Rosa's conclusion by ignoring that testimony.

MV testified that she started dating Rosa in January or February 2017. Doc. 9-3, at 116–17. In mid-February, MV told Rosa that she wanted to end

25

their relationship. *Id*. at 120–21. Rosa continued to pursue MV. *Id*. at 121. She testified about an incident—that occurred after she told Rosa that she wanted to break things off—when Rosa came to her home to make sure that no one else was there. Doc. 9-3, at 127–28. According to MV, Rosa was:

> Very upset, banging on my window, yelling,
> screaming, Open the door, open the door, who is in
> there , somebody is in there, I'm going to kill him, I
> have a shotgun in my car.

Doc. 9-3, at 128.

MV testified that from there, she tried to avoid Rosa and he became "more and more upset every day that [she] would tell him [that she] did not want to go see him, because he wanted [her] to spend the night with him all the time, and [she] did not want to do that." Doc. 9-3, at 131. MV testified that Rosa's behavior culminated with the events of March 6 and 7, 2017.  *Id*.

On March 6, 2017, Rosa was expecting MV to arrive at his house at 8:00pm, but MV testified that she was not actually planning to go there.  Doc. 9-3, at 131. At 8:00, he began calling and texting her and she ignored Rosa's efforts. *Id*.

MV arrived home around midnight. *Id*. at 132. She testified that she checked her messages and saw that Rosa had told her that if she didn't go to his house, "he was going to expose" her. *Id*. at 134. She then checked Facebook and saw that Rosa had posted pictures of MV and Rosa "hugging, kissing, like if we were a couple." *Id*. at 135. But because he possessed "sexually oriented photos" of her, she testified that she was concerned about what he might do.

26

*Id.* So after MV arrived home with her son, she called Rosa. *Id.* at 132. According to MV, Rosa was very upset and told MV that if she did not go to his house, he would kill her and her son. *Id.* This threat prompted MV to go to Rosa's house. *Id.* at 135–36.

MV testified that when she arrived at Rosa's house, "[h]e was sitting on his recliner, naked, and there was a bottle of liquor and there was cocaine on the table." *Id.* at 137. She told Rosa that she wanted him to stop his behavior and that she was not interested in him. *Id.* at 137–40. MV testified that at some point, she got up to leave and Rosa responded by slapping or pushing her into his television and saying that she was "not going anywhere" and was "going to stay here." *Id.* at 140.

MV testified that she sat down and said she needed to go home to get some medicine. *Id.* at 141. But Rosa responded, "you're not going anywhere, you're staying here until we get to the bottom of this." *Id.* at 141. At some point, MV convinced him to drive her home to get her medicine. *Id.* When they went outside, MV moved toward her car and Rosa said, "[W]e're not going to do this, we're not getting your medicine." *Id.* at 141–42.  According to MV, she then "tried to run away…. I tried to run towards the street…. He tackled me down." *Id.* at 142. She testified that she got "up and he's trying to pull me in the house. In my mind, I said, I can't go in there, because I'm not going to come out." *Id.* She testified that Rosa "slap-push[ed]" her back toward his house. *Id.*

MV testified that Rosa told MV that she was going into the house and she said "no." *Id*. at 143. According to MV, she struggled with Rosa, who tried to force her into the house while she was "fighting him off trying to not get in the house." *Id*. "He's pulling my hair a lot. Every time I would run away, he would tackle me, put his knee on the back of my back, and choke me with his arm so I couldn't yell or scream." *Id*. She "remember[ed] just fighting with him for a while, going back and forth, him hitting [her], him tackling [her] down, [her] trying not to get in the house, him dragging [her] from the street onto the driveway, and [she] was just trying to hold onto anything [she] could get a hold of." *Id*. at 143–44. MV testified that she struggled outside of Rosa's house for about an hour. *Id*. at 144. During the struggle, Rosa took MV's phone and smashed it on his driveway. *Id*. at 149. Eventually, MV relented when Rosa said that if she didn't go into his house, he was  going to knock her out and drag her in. *Id*. at 146.

When asked about her thoughts at that point, MV said:

> That I was going to die if he got me in there. So I tried to hold on to my car while we were going into the house, and he banged my head against the car, my trunk, or the hood of my car. I was trying to hold on, but he got me in the house.

Doc. 9-3, at 146.

MV testified that by the time Rosa dragged MV into his house, she was covered in mud. *Id*. He then forced her to undress and shower. *Id*. at 147. MV

testified that she decided to be compliant in the hope that "maybe he wouldn't hurt [her] anymore and let her go." *Id.* at 148.

After the shower, Rosa directed MV to lay in bed with him. *Id.* at 149. They laid in bed and talked until her phone alarm went off at 6:00 a.m. because she was supposed to be at work at 7:30am. *Id.* at 152–53. MV testified that once she tried to put on her clothes to leave, Rosa said "No, no, you know what you have to do before you go." *Id.* at 154. MV testified that she knew that Rosa meant she had to have sex with him. *Id.* She responded that she "didn't feel well," and that "we could do that after work." *Id.* at 155. But Rosa said "no" and that she was "not leaving here until we do it." *Id.* So MV "laid on the bed and … let him do what he had to do." *Id.*

MV testified that Rosa "penetrate[d]" her, Doc. 9-3, at 165, and that during that time, she repeatedly said that she didn't feel well and that her stomach hurt. *Id.* at 155. "When it was over," she got up, put on her clothes, told Rosa she would come back, and left. *Id.*

But there's more. AP corroborated MV's testimony about the incident when Rosa banged on MV's window. Doc. 9-4, at 72–73. AP also testified about his mother's demeanor before and after the events of March 6 and 7. *Id.* at 74–77. He described that on the morning of March 7, 2017, MV "was very fidgety and scared[,] … looked like a complete mess," and "could barely speak." *Id.* at 77. AP also testified that MV's phone "was smashed." *Id.* at 79. Finally, MV's

29

muddy clothing and possessions were observed by police officers and Nurse Riffe. *Id.* at 134, 170

Viewing this evidence in the light most favorable to the prosecution, contrary to Rosa's assertion, any rational jury could have found that he "compelled [MV] to submit by force or threat of force." *See* Ohio Rev. Code § 2907.02(A)(2).

Even putting this aside, this Court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205. Rosa doesn't attempt to explain what's unreasonable about the Ohio court of appeals' sufficiency determination. Even if he had, however, he would fare no better. Here's what the Ohio court of appeals had to say about Rosa's sufficiency challenge:

> {¶17} Rosa was convicted of rape, in violation of R.C. 2907.02(A)(2). It provides that no person shall engage in sexual conduct with another by purposely compelling the other to submit by force or threat of force. In this case, Rosa was charged with purposely compelling the victim to engage in vaginal intercourse.

> {¶18} Pursuant to R.C. 2901.01(A), "force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." A defendant purposely compels his victim to submit by force or threat of force when he uses physical force against the victim, or creates the belief that physical force will be used if the victim does not submit. *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), paragraph one of the syllabus. Force need not be overt and physically brutal, it can be subtle and psychological. *State v. Fowler*, 27 Ohio App.3d 149, 154, 500 N.E.2d 390

(8th Dist.1985). The element of force can be inferred from the circumstances surrounding the sexual conduct and is established if it is shown that the victim's will was overcome by fear or duress. *State v. Smelcer*, 89 Ohio App.3d 115, 126, 623 N.E.2d 1219 (8th Dist.1993).

{¶19} Rosa contends that no evidence was presented that he purposely compelled the victim to submit by force or threat of force to engage in sexual conduct. In support, Rosa cites to this court's decision of *State v. Dobson*, 8th Dist. Cuyahoga No. 100418, 2014-Ohio-3710. In *Dobson*, the victim testified that although she did not want to have sex with Dobson, she did not protest. Additionally, the victim did not testify that she believed Dobson would use force against her if she did not submit to sexual conduct. The majority decision found that no evidence was presented that the earlier assault caused the victim to be overcome by fear or duress. Accordingly, the *Dobson* majority court concluded that the state failed to present sufficient evidence to prove that *Dobson* purposely compelled the victim to submit by force or threat of force — "when the state fails to prove purposeful force or threat of force, as a matter of law, the case for rape falls under the sufficiency standard of proof." *Id*. at ¶ 20.

{¶20} Although the facts in this case are similar to those in *Dobson*, we find that sufficient evidence was presented in this case that the victim's will was overcome by fear or duress such that a rational trier of fact could infer the element of force based on the totality of the circumstances and the violence the victim endured earlier that morning.

{¶21} The jury heard the victim testify that she went to Rosa's home that night because he told her that if she did not come over, he was going to kill her and her son. The first time she attempted to leave his house, Rosa slapped her in the face, pushed her, and told her that she was "not going anywhere; you are going to stay here." While appellant was assaulting and choking the victim outside the house, he told her

"if you don't get your ass in the house I'm going to knock you the f*** out and drag you in myself." The victim testified that she thought she was going to die if he got her back into the house.

{¶22} The victim also testified that once Rosa forced her back into the house, he made her shower. She stated that during that time, she was trying to figure out how she would get out of the house. She thought that Rosa might let her go if she was compliant and did what he said. However, when she tried to leave in the morning, Rosa became agitated and told her that she had to have sex with him before she could leave. Although she told him that she did not feel well, he said that she was not leaving until they had sex. The victim stated she "let him do what he had to do." It is clear from the victim's testimony, Rosa's actions, and the evidence in this case that the victim submitted to the sexual conduct because she believed that was her only means to escape him and any additional acts of violence.

{¶23} Additionally, the jury heard threatening voicemails and video message recordings from Rosa to the victim. In one recording, Rosa told the victim that she would not be "turning [him] f****** down anymore." Importantly, the night before the attack, Rosa threatened the victim that he would post photographs and videos on social media if she did not return his calls.

{¶24} The jury also heard the victim's 911 call that she made when she arrived home immediately following her escape in which she told the dispatcher that she was "tortured all night long" and that Rosa had hit her. When the dispatcher asked her how she escaped, the victim stated that she "did what he wanted" and that she "pretended everything was okay." She stated that he choked and beat her, and that she was scared.

{¶25} From the victim's testimony and statements made immediately following the attack, the totality of the circumstances reveal that the victim's will was

overcome by fear or duress; thus, the element of force or threat of force can be inferred. It is clear that the victim was acting in self-preservation by acquiescing to Rosa's demands. Her testimony allowed a reasonable jury to conclude that she acted only to diffuse the situation so that she could escape, especially because prior attempts to escape were unsuccessful and she was assaulted during those attempts.

{¶26} Accordingly, viewing the evidence in the light most favorable to the state, sufficient evidence was presented to prove the elements of rape — that Rosa purposely compelled the victim to engage in sexual conduct by force or threat of force.

*Rosa*, 2019 WL 6358475, at *3–4. In a footnote, the court added that it "need not address the finding of guilt as to the kidnapping charge in Count 2 because that offense merged with the rape offense in Count 1, and the state elected that Rosa be sentenced on Count 1." *Id*. at *4 n.1.

Little else needs to be said. Given that the evidence is sufficient under *Jackson*, the state appellate court's determination that the evidence was sufficient to support the conviction is not unreasonable.

2. *Ground two is procedurally defaulted and fails on the merits*

Rosa argues that the trial court violated his due process rights when it allowed Detective Adkins to testify that—after giving him a *Miranda* warning—"he did not wish to give her a statement about the allegations or talk to her." Doc. 1, at 8. Relying on Ohio's contemporaneous-objection rule, the Warden alternatively argues that Rosa's second ground claim is procedurally defaulted. Doc. 9, at 28–30. I agree.

33

A federal habeas court "will not consider an issue of federal law on direct review from a judgment of a state court if that judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *Harris v. Reed*, 489 U.S. 255, 260 (1989). "In Ohio, [the] failure to raise a contemporaneous objection to error in the trial court 'is an adequate and independent state ground to bar federal habeas review absent a showing of cause and prejudice.'" *Mason v. Brunsman*, 483 F. App'x 122, 130–31 (6th Cir. 2012) (quoting *Scott v. Mitchell*, 209 F.3d 854, 867 (6th Cir. 2000)). And an Ohio appellate court's plain-error review of an alleged error does "not constitute a waiver of the procedural default." *Id.* at 130–31; *see Williams v. Burt*, 949 F.3d 966, 973 (6th Cir. 2020) ("we have consistently held that application of the plain error standard to an unpreserved claim does not save a petitioner from a defense of procedural default raised at the habeas stage"); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("we view a state appellate court's review for plain error as the enforcement of a procedural default").

Here, the Ohio court of appeals applied and enforced the state's contemporaneous-objection rule. *See Rosa*, 2019 WL 6358475, at *6–7 ("Because no objection was raised, we review for plain error.… [A]any testimony that he would not talk to the police was not prejudicial and does not rise to the level of plain error[.]"). Absent cause and prejudice, then, Rosa's claim is defaulted. *Scott*, 209 F.3d at 867.

34

Rosa claims that he can show cause in that his appellate counsel was ineffective for failing to preserve this issue as a claim of ineffective assistance of trial counsel. Doc. 10, at 24–25. But ineffective assistance of appellate counsel can't serve as cause to excuse a procedural default if the ineffective assistance of appellate counsel claim is itself procedurally defaulted. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). And although Rosa did apply to reopen his appeal based on ineffective assistance of appellate counsel, he didn't raise this issue in his application. *See* Doc. 9-1 at 170–77. So Rosa can't show cause for this default.

But even if Rosa hadn't defaulted this issue, he couldn't prevail. As noted, to obtain relief under 28 U.S.C. § 2254, he must show either that the state court's decision (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). In his traverse, however, Rosa skips over Section 2254(d) and argues as if this Court is directly reviewing the trial court. He offers little to support the idea that the Ohio court of appeals decision was contrary to clearly established Federal law or was based on an unreasonable determination of the facts.

In the course of its plain error review, the Ohio court appeals said:

> {¶36} In support of his argument, Rosa cites to *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91

(1976). In *Doyle*, the defendants were given Miranda warnings after they were arrested. During trial, each defendant testified and gave an exculpatory story that they had not previously told to the police or the prosecutor. Over their counsel's objection, they were cross-examined as to why they had not given the arresting officer the exculpatory explanations. The Supreme Court reversed the defendants' convictions, holding that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. 2240. In this case, because Rosa did not testify, *Doyle*'s prohibition of direct impeachment with post-arrest silence does not apply.

{¶37} However, a *Doyle* violation can also occur when the state uses other witness testimony about a defendant's silence as implicit evidence or inference of a defendant's guilt. *See, e.g., State v. Froe*, 4th Dist. Scioto No. 02CA2860, 2003-Ohio-7334 (prosecutor can implicitly imply the defendant's silence is evidence of guilt through police testimony about the defendant invoking his right to remain silent or to consult an attorney); *State v. Jones*, 1st Dist. Hamilton No. C-970043, 1998 Ohio App. LEXIS 3938, 1998 WL 542713, (Aug. 28, 1998). "[T]he test under *Doyle* is to determine whether the prosecutor's comment was extensive — 'whether an inference of guilt from silence is stressed to the jury * * *' as a basis of conviction." *State v. Lanier*, 6th Dist. Ottawa No. OT-95-051, 1996 Ohio App. LEXIS 3286, 1996 WL 430856, 11 (Aug. 2, 1996), quoting *United States v. Newman*, 943 F.2d 1155, 1158 (9th Cir. 1991).

{¶38} Applying the *Doyle* test, we find that Detective Adkins's single comment about Rosa's silence was not extensive that an inference of guilt was stressed to the jury and used as a basis for conviction. Rather, we find that this comment was more akin to a response about the detective's course of investigation.

{¶39} In *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, the Ohio Supreme Court held that use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment, and that the use of a defendant's post-arrest, post-Miranda invocation of his right to counsel as substantive evidence of guilt violates the Fourteenth Amendment. The court specifically noted, however, that "[the investigating officer's] testimony that he had made an appointment to meet with [the defendant] to discuss the case but that the appointment was not kept is [a] legitimate [governmental practice]" because the testimony qualified as evidence of the "course of investigation." *Id.* at ¶ 32, citing *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000).

{¶40} Much like in *Leach*, Rosa did not testify at his trial, so evidence of his post-arrest silence was not used to impeach his testimony. However, unlike in *Leach*, Detective Adkins's testimony of Rosa's decision not to give a statement was not elicited as substantive evidence of Rosa's guilt; rather, it was a single comment simply mentioned in the context of Detective Adkins's description of her course of investigation. The state did not rely on this evidence during its closing to support its allegations of guilt or rely on it at any other time. Accordingly, Detective Adkins's testimony did not violate Rosa's due process rights. *See, e.g., State v. Rahman*, 23 Ohio St.3d 146, 153, 492 N.E.2d 401 (1986) (single comment on defendant's post-arrest silence does not reach the serious constitutional impairment of the repeated references to such silence as recognized in *Doyle*).

{¶41} Additionally, the jury heard directly from Rosa through the recorded messages that he left on the victim's voicemail and on social media posts. In the recorded messages that Rosa left after the attack, he repeatedly stated that he was sorry for hurting the victim, hoped she was okay, and that he "messed up." He also stated that his actions were "out of

> place," blaming his behavior on alcohol and "perico," which is slang for cocaine. Based on these admissions and statements, any testimony that he would not talk to the police was not prejudicial and does not rise to the level of plain error such that a manifest injustice occurred that affected the outcome of the trial. Rosa's third assignment of error is overruled.

Rosa says nothing about the court of appeals' determination that the single reference at issue, which was not mentioned again or relied on, is distinguishable from *Doyle v. Ohio*, 426 U.S. at 610 (1976). *Cf. Chapman v. United States*, 547 F.2d 1240, 1250 (5th Cir. 1977).[4] And he doesn't dispute the court's determination that any error was harmless.[5] It follows that he hasn't met the standard in Section 2254(d). *See Jones v. Bradshaw*, 46 F.4th 459, 472 (6th Cir. 2022) (explaining that "under AEDPA, it is petitioner's burden to demonstrate that" his claim meets the standard in Section 2254(d)).

---

[4]    In *Chapman*, the court held that:

> When there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error.

547 F.2d at 1250.

[5]    *Doyle* violations are subject to harmless error analysis. *Meeks v. Havener*, 545 F.2d 9, 9–10 (6th Cir. 1976).

3.   *Ground three fails on the merits*

In his third ground, Rosa alleges that his appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to raise three issues, discussed in turn below. A successful ineffective-assistance claim requires a petitioner to demonstrate that: (1) "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the defense." *Jones*, 46 F.4th at 487–88 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The first prong is satisfied when a petitioner "show[s] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. The second prong is satisfied when the petitioner "show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694). The prongs are conjunctive, so failure to satisfy one prong is fatal to an ineffective assistance claim and a court need not consider the other. *Strickland*, 466 U.S. at 697.

*Strickland* commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689–90; *Pinholster*, 563 U.S. at 196 ("[t]he Court of Appeals was required not simply to 'give [the] attorneys the benefit of the doubt,' but to affirmatively entertain the range of

possible 'reasons Pinholster's counsel may have had for proceeding as they did'") (citation omitted).

The combined effect of *Strickland* and 28 U.S.C. § 2254(d) is " 'doubly deferential'" review. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "When [Section] 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105; *Foust v. Houk*, 655 F.3d 524, 533–34 (6th Cir. 2011). By design, "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted).

A defendant has a right to effective assistance of counsel in connection with the defendant's first appeal of right. *Evitts v. Lucey*, 469 U.S. 387, 393–94 (1985). Appellate counsel is not required, however, to raise every "nonfrivolous point[] requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). In fact, "winnowing out weaker arguments on appeal and focusing on one central issue[,] if possible," *id.* at 751, is "the hallmark of effective appellate advocacy," *Smith v. Murray*, 477 U.S. 527, 536 (1986). "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Robbins v. Mitchell*, 47 F. App'x 380, 385 (6th Cir. 2002) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.

1986)). The obvious corollary is that "appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

As an initial, global matter Rosa's third ground fails because he hasn't attempted to show that his appellate "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Indeed, he hasn't explained, as he must, how or why the arguments he says appellate counsel should have raised "'are clearly stronger than" the four arguments that counsel "presented." *Robbins*, 47 F. App'x at 385. So he hasn't overcome the presumption as to any of his subclaims that appellate counsel was effective. *Id*. Nonetheless, even considering each subclaim individually, Rosa cannot prevail.

### 3.1 *Failure to object to a leading question*

Rosa's first subclaim is that appellate counsel should have raised ineffective assistance because trial counsel didn't object to an allegedly leading question. As noted above, during the prosecutor's direct examination of MV, the following discussion took place:

> Q.     Is that the bedroom that you laid in with him?
>
> A.     Yes.
>
> Q.     I want to be a little more specific. Before you told us you had sex, with him, can you tell us what type of sexual activity occurred?
>
> A.     He just had -- we just had regular sex, him on top of me. That's it.
>
> Q.     *Vaginal sex*?

41

> A.    Yes, vaginal sex.
>
> Q.    Did he penetrate you?
>
> A.    Yes. That is his room to go out into the back. Like, there's a sun room off of there, but it's off of his bedroom.

*Id*. at 164–65 (emphasis added).

Rosa faults appellate counsel, and by extension trial counsel, because the prosecutor asked the emphasized question. The Constitution, however, does not prohibit leading questions. Indeed, the regulation of them is largely left to the trial judge's judgment. *See United States v. Kuehne*, 547 F.3d 667, 692 n.8 (6th Cir. 2008). So Rosa would have to show, at a minimum, that the issue would have some chance of success under state law. But under Ohio law, it wouldn't. *See State v. Jackson*, 751 N.E.2d 946, 962 (Ohio 2001) (because "it is within the trial court's discretion to allow leading questions on direct examination[,] … we do not find that the failure to object to any leading questions constitutes ineffective assistance of counsel"). The same would be true in federal court. *See Kuehne*, 547 F.3d at 692 n.8 (noting that federal appellate courts have "manifested" "[a]n almost total unwillingness to reverse" based on leading questions).

And it's not clear that the question was improper. "[I]t is not improper to ask leading questions on direct examination when the questions are used to clarify testimony." *Bannasch v. Burt*, No. 09-11564, 2011 WL 6837562, at *14 (E.D. Mich. Dec. 29, 2011). Clarifying is an apt way to describe the prosecutor's question.

Also, the likely outcome had trial counsel objected—assuming the objection were sustained—would have been that the prosecutor would have asked MV to specifically state how Rosa raped her. From Rosa's perspective, the allegedly leading question was the preferrable outcome. So Rosa hasn't cleared *Strickland*'s bar.

Rosa also can't clear Section 2254(d). When confronted with this claim in Rosa's application to reopen his appeal, the Ohio court of appeals said:

> {¶ 17} Evid.R. 611(C) provides in pertinent part as follows: "Leading questions should not be used on direct examination of a witness except as may be necessary to develop the witness' testimony." In *State v. Johnson*, 8th Dist. Cuyahoga No. 82340, 2003-Ohio-6634, this court ruled that it is wholly within the trial judge's discretion to permit the state to ask leading questions of its own witness. The exception concerning the need to develop testimony is quite broad. This court notes that the rape indictment specified vaginal rape. Thus, the subject questions were necessary to develop the testimony to establish the elements of the crime. Furthermore, the failure to object to leading questions in direct examination almost never rises to the level of ineffective assistance of counsel. *State v. Wilson*, 8th Dist. Cuyahoga No. 107806, 2019-Ohio-4056. Following the admonition of the Supreme Court, this court will not second-guess appellate counsel's professional judgment in declining to argue this point.

*State v. Rosa*, 2020-Ohio-3964, 2020 WL 4533616, at *3 (Ohio Ct. App. 2020).

In the face of the court's decision, Rosa again skips over Section 2254(d). He offers little to support the idea that the Ohio court of appeals' decision was contrary to clearly established Federal law or was based on an unreasonable

determination of the facts. Instead, Rosa only musters the complaint that neither the United States Supreme Court nor the Ohio Supreme Court has "affirmed" that "the failure to object to leading questions in direct examination almost never rises to the level of ineffective assistance of counsel." Doc. 10, at 30. Rosa, however, ignores the Ohio Supreme Court's decision in *Jackson*, 751 N.E.2d at 962, and the near universal recognition among federal courts that appeals challenging leading questions don't present strong arguments. *See Kuehne*, 547 F.3d at 692 n.8. This subclaim is meritless.

### 3.2 *AP's testimony about Rosa's prior bad acts and character*

In his second subclaim, Rosa says that appellate counsel was ineffective for not claiming that trial counsel was ineffective when he failed to object during the AP's "testimony concerning petitioner's alleged prior bad acts and about his character." Doc. 1, at 9. In his traverse, Rosa explains that he is focusing on AP's testimony about the time Rosa came to MV's house and banged on the outside of the home.[6] Doc. 10, at 33–35; *see* Doc. 9-4, at 72–73.

Recall that MV testified that in mid-February 2017, she told Rosa that she wanted to end their relationship. Doc. 9-3, at 120–21. At some point between then and March 6, 2017, Rosa came to MV's home to make sure that no one else was there. Doc. 9-3, at 127–28. According to MV, Rosa was:

---

[6]    Rosa also quotes AP's testimony that MV told AP that Rosa raped her. Doc. 10, at 32. But his actual argument doesn't mention this aspect of AP's testimony. *See id*. at 33–35. And his prior-bad-acts argument doesn't apply to that aspect of AP's testimony.

> Very upset, banging on my window, yelling, screaming, Open the door, open the door, who is in there , somebody is in there, I'm going to kill him, I have a shotgun in my car.

Doc. 9-3, at 128.

The prosecution later called AP to testify. Doc. 9-4, at 67. He testified about this incident:

> Q.     Did there ever come a time when he came over to your house uninvited?
>
> A.     Yes.
>
> Q.     Can you please describe for the jury when that occurred.
>
> A.     I recall sitting in my room and hearing a lot of loud banging outside of the house. So I go to my mom's room, and I asked her what the loud banging is, she said that it was him.
>
> Q.     Without getting into what she said, did the banging continue?
>
> A.     For a good five minutes afterwards, yes.
>
> Q.     Okay. Did there come a time when the banging stopped?
>
> A.     Yes.
>
> Q.     How did that happen?
>
> A.     When my mom left the house to go outside and talk to him.
>
> Q.     Now, you say "him," who are you referring to?
>
> A.     Mr. Rosa.
>
> Q.     How do you know that it was Mr. Rosa banging on the door?
>
> A.     When I saw his face when she cracked the door open to talk to him.

Q.      Could you hear his interaction with your mom after she went outside?

A.      Not really. As soon as I saw his face, I went back to my room.

Q.      When you saw his face, could you tell if he was angry, yelling?

A.      Yeah, he had a very unhappy expression on his face.

Q.      Was that last time that you saw Mr. Rosa prior to March 7th?

A.      Yes.

*Id.* at 72–73.

Rosa says that trial and appellate counsel were ineffective because AP's testimony impermissibly concerned prior bad acts. Doc. 10, at 33–35. Again, he can't clear the *Strickland* hurdle. AP's testimony corroborated his mother's testimony. And it showed the nature of MV's interaction with Rosa, which was relevant to how she behaved when she interacted with him on March 6 and 7, 2017. So it's not even clear that AP's testimony was inadmissible. Indeed, the Ohio Supreme Court has held that similar evidence was admissible because it "illustrated [a] tumultuous relationship … in an incident that took place just weeks before," and "also tended to prove the absence of accident and was evidence suggesting intent." *State v. Nields*, 752 N.E.2d 859, 882 (Ohio 2001). "The evidence showed defendant's strained relationship with [his victim] within a month of the murder." *Id*. Given *Nields*, it is not possible to say that appellate counsel was not "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *see United*

*States v. Sanders*, 404 F.3d 980, 986 (6th Cir. 2005) (holding that counsel is not ineffective for failing to object to admissible evidence).

Further, the Ohio court of appeals held that:

> {¶ 20} These arguments are not well-taken. Under Evid.R. 404(B), such evidence may be admissible to show motive, opportunity, intent, preparation, plan or knowledge. Such evidence also shows the tumultuous and strained relationship between the individuals shortly before the rape. Such evidence can show motive and intent and is admissible.

2020 WL 4533616, at *4. This Court is bound to defer to this interpretation of Ohio's rules of evidence. *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005).

Additionally, Rosa doesn't explain how this aspect of the Ohio court of appeals' decision was contrary to clearly established federal law or was based on an unreasonable determination of the facts. So he also doesn't clear the Section 2254(d) hurdle. *See Jones*, 46 F.4th at 472 (explaining that "under AEDPA, it is petitioner's burden to demonstrate that his claim meets the standard in Section 2254(d)).

### 3.3 *Rosa's third subclaim fails on the merits*

In his third subclaim, Rosa says that appellate counsel was ineffective for not raising ineffective assistance of trial counsel as to the failure to object when Riffe was questioned about MV's medical record. Doc. 9-1, at 9. Specifically, the prosecutor asked whose name was listed as the person who committed the assault and Riffe responded, "Edito Rosa." Doc. 9-4, at 113.

Rosa claims that the admission of Riffe's testimony was error, but doesn't claim that trial counsel's failure to object caused him any prejudice. The lack of prejudice alone is a valid reason for appellate counsel to forgo the issue. So Rosa strikes out on *Strickland*'s first prong.

Rosa also doesn't say that appellate counsel's failure to raise the issue caused him any prejudice. And it is far from apparent that the testimony or any failure by either counsel caused Rosa any prejudice. Afterall, MV had already testified and there was no question that she blamed Rosa from the start. So Riffe's testimony was simply cumulative and appellate counsel's failure to raise an issue about it could not have prejudiced Rosa. Rosa's third claim also can't clear the *Strickland* hurdle.

Section 2254(d) is also a problem for Rosa. The Ohio court of appeals had this to say about Rosa's argument:

> {¶ 22} Rosa's final argument is that trial counsel failed to object to the SANE nurse's testimony. The nurse testified from the form she filled out, which read that Edito Rosa vaginally raped the victim. This court has ruled that such testimony, if error, is harmless because it is merely cumulative to the admissible evidence. *State v. Smith*, 8th Dist. Cuyahoga No. 90476, 2008-Ohio-5985. Thus, appellate counsel in the exercise of professional judgment properly declined to argue this argument.

2020 WL 4533616, at *4.

The court's reasoning that the testimony was harmless and cumulative is neither contrary to clearly established federal law nor was it based on an

48

unreasonable determination of the facts. Rosa, who merely identifies an evidentiary error, doesn't claim otherwise. This subclaim is meritless.

### 4. Ground four is unexhausted

Rosa's fourth ground concerns Paramedic Tatangelo's testimony. Doc. 1, at 11. Recall that Tatangelo explained that when he responds to an emergency call, he "complete[s] a patient care report," which is "[b]asically a recorded patient care document that pertains to the patient's condition at the time." Doc. 9-5, at 5. After Tatengelo testified about MV's patient care report, *id.* at 6, the following happened:

> Q.     Okay. Did she tell you with the purpose of your  medical treatment what had happened to her?
>
> A.     She disclosed everything that happened to her. Yes, she did.
>
> Q.     Looking at your narrative, can you read for us what she told you?
>
>> MR. RICHARDSON:  Just wanted to put in an objection on this one, Judge.
>>
>> THE COURT:         Overruled.
>
> A.     She stated that she was involved in a physical altercation with Mr. Edito Rosa. She stated that Mr. Rosa attacked her in his driveway. She was punched several times and choked on top of her car. She was then forced inside his home. Patient also stated she was covered in mud, and he made her take a shower with him. *Around 5:00 a.m., in fear for her life, she was forced to have sex with him*. After sex, the patient made an agreement to move in with him. He then allowed her to leave the home. The patient states she drove to her home, where she then called 911.

*Id.* at 9 (emphasis added).

In his fourth ground, Rosa claims that "[t]he trial court erred in admitting into evidence the narrative" MV gave to Tatangelo, "which is an objectively unreasonable application of *Chapman v. California*." Doc. 1, at 11. He asserts that MV's "statement did not aid in providing medical care and treatment but only served to aid in prosecution. The …statement went to the very issue at trial—[Rosa's] purposeful intent to force [MV] to engage in sexual conduct." *Id*. In his traverse, Rosa says that the emphasized portion of Tatangelo's testimony, quoted above, was hearsay, which was not admissible under Ohio Rule of Evidence 803(4) (statements made for purposes of medical diagnosis or treatment). Doc. 10, at 38–39.

Federal habeas courts can only grant relief under Section 2254 for "violation[s] of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Because Rosa is unrepresented, the Court must construe his claims liberally. *Reho v. United States*, 53 F.4th 397, 399 (6th Cir. 2022). Liberally construed, Tatangelo has arguably raised a Sixth Amendment Confrontation Clause issue.[7] *Cf. Dever v. Mac*k, 40 F. App'x 980, 984–86 (6th Cir. 2002) (discussing a Confrontation Clause issue in the context of Ohio Rule of Evidence 803(4)).

---

[7]   Construing Rosa's petition as raising a Confrontation Clause issue might be overly generous. *Cf. Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004) ("[l]iberal construction does not require a court to conjure allegations on a litigant's behalf"). But because Rosa cannot prevail, there is no need to decide this question.

A federal court may not grant a writ of habeas corpus, however, unless the petitioner "fairly presen[ts]" his claims to the state courts before raising them in a federal habeas corpus action. *Robinson*, 950 F.3d at 343. To *fairly present* a constitutional claim, the "petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law." *Koontz*, 731 F.2d at 368. This requirement presents an obstacle for Rosa. When he presented ground four to the Ohio Supreme Court and the Ohio court of appeals, Rosa failed to mention the Sixth Amendment or any other provision of the Constitution. *See* Doc. 9-1, at 82–85, 145–46. He also didn't:

> (1) rel[y] upon federal cases employing constitutional analysis; (2) rel[y] upon state cases employing federal constitutional analysis; (3) phras[e] [his claim] in terms of constitutional law ... ; or (4) [allege] facts well within the mainstream of constitutional law.

*McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) ("not[ing] four actions a defendant can take which are significant to the determination whether a claim has been 'fairly presented'"). Instead, he raised this issue as a pure question of Ohio law, *see* Doc. 9-1, at 82–85, 145–46, which is not something a court can review under Section 2254, *see Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rosa thus failed to fairly present this issue to Ohio's courts.[8] And that

---

[8]    The Warden relied in his return on Rosa's failure to fairly present this issue to Ohio's courts. *See* Doc. 9, at 44. Despite this fact, Rosa says noting in his traverse about his omission and doesn't argue any basis to conclude that

failure forecloses this Court's review of ground four.[9] *Robinson*, 950 F.3d at 343.

Finally, to the extent that Rosa attempts in his traverse to assert cumulative errors, Doc. 10, at 39–40, his argument comes too late. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005); *Dothard v. MacLaren*, No. 13-15217, 2015 WL 470585, at \*26 (E.D. Mich. Feb. 3, 2015) (citing cases).

## Conclusion

For the above reasons, I recommend that the Court grant Respondent's motion and dismiss Rosa's petition.

Dated: August 8, 2023

<u>  /s/ James E. Grimes Jr.  </u>
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).

---

the Court is not foreclosed from reviewing his fourth ground. *See* Doc. 10, at 38–39.

[9] Rosa also ignores the Ohio court of appeals' decision that if Tatangelo's testimony violated rule 803(4), the error was harmless. *Rosa*, 2019 WL 6358475, at \*6. So even if Rosa had preserved a constitutional claim as to ground four, he could not prevail. *See Jones*, 46 F.4th at 472 (explaining that "under AEDPA, it is petitioner's burden to demonstrate that" his claim meets the standard in Section 2254(d)).